# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# LEWIS T. BABCOCK, JUDGE

Civil Case No. 06-cv-02227-LTB

JACOB ROBERT SCHNEIDER,

    Plaintiff,

v.

CATERPILLAR INC., a Delaware corporation,

    Defendant.
_____

# ORDER
_____

This products liability case is before me on Defendant, Caterpillar Inc.'s, Motion for Summary Judgment [**Docket # 23**] and accompanying Brief [**Docket # 24**], Plaintiff's Response [**Docket # 46**], Defendant's Reply [**Docket # 47**], and Plaintiff's Surreply [**Docket # 52**]. A hearing on Defendant's Motion was held on February 28, 2008. Based upon review of the papers and the case file, as well as the arguments made at the hearing held on February 28, 2008, and for the reasons stated below, I GRANT Defendant's Motion for Summary Judgment [**Docket # 23**].

## I. BACKGROUND

This case arises out of an injury suffered by Plaintiff on November 15, 2004, while he was riding on a piece of asphalt paving equipment—known as a "screed"—manufactured by Defendant. A screed is an attachment at the rear of an asphalt paver that applies the asphalt at the desired depth and then compacts and smooths it. The screed in question has an adjustable width that can be widened or narrowed on either side by means of a hydraulic device. The hydraulics are operated by six screed extension control switches, three for each side. The screed includes an

extension tube that extends or contracts with the screed when the hydraulics are operated.

Plaintiff—an employee of LaFarge North America—was working as a member of an asphalt paving crew on November 15, 2004. Although Plaintiff was not working on the screed or the paver, he chose to ride on the screed as the paver backed up to make another pass. Plaintiff sat on the extended screed extension tube for the ride. For reasons unknown, the screed began to retract, crushing Plaintiff and causing serious injury. The retraction stopped and the screed extended slightly, but then retracted again, crushing Plaintiff a second time.

Plaintiff filed this suit, charging Defendant with strict liability and negligence. Defendant moves for summary judgment on the basis of COLO. REV. STAT. § 13-80-107, a statute of repose that bars claims against the manufacturer of new manufacturing equipment seven years after the equipment is first put to use.

## II. STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is not proper if—viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor—a reasonable jury could return a verdict for that party. *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992).

The non-moving party has the burden of showing there are specific issues of material fact to be determined. *Celotex*, *supra*, 477 U.S. at 322. A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477

2

U.S. 242, 255 (1986). It is not enough that the evidence be merely colorable. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is therefore appropriate only if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Lucas v. Mountain States Tel. & Tel.*, 909 F.2d 419, 420 (10th Cir. 1990); FED. R. CIV. P. 56(c).

In a motion for summary judgment, I view the evidence "through the prism of the substantive evidentiary burden." *Liberty Lobby*, *supra*, 477 U.S. at 254. The inquiry is based on "the quality and quantity of evidence required by the governing law" and "the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant." *Id*. Accordingly, in this products liability case, Plaintiff must show material facts in dispute by a preponderance of the evidence in order to defeat Defendant's motion for summary judgment. Plaintiff meets this burden if he sets forth evidence that—if believed by the ultimate factfinder—makes it more likely than not Defendant's product had a defect or Defendant was negligent, and more likely than not Defendant is not protected by the statute of repose.

### III. ANALYSIS

Defendant moves for summary judgment on the basis of COLO. REV. STAT. § 13-80-107. Under the statute, manufacturers of new manufacturing equipment are exempt from suit for any manufacturing defects—other than hidden defects—seven years after the equipment is first put to use. The parties do not dispute that the machine was first put to use more than seven years before Plaintiff's accident. Defendant argues summary judgment is appropriate because: (1) the screed is new manufacturing equipment; (2) the screed possessed no hidden defects; (3) Plaintiff's conduct

constituted an unforeseeable misuse as a matter of law; and (4) Plaintiff cannot show his injuries were the result of a defect in the screed. As I hold the screed is "new manufacturing equipment" under the Colorado statute and that the screed possessed no hidden defects, I need not reach Defendant's remaining arguments.

## A. The screed is "new manufacturing equipment"

The Colorado statute defines "manufacturing equipment" as follows: "(2) As used in this section, 'manufacturing equipment' means equipment used in the operation or process of producing a new product, article, substance, or commodity for the purposes of commercial sale and different from and having a distinctive name, character, or use from the raw or prepared materials used in the operation or process." COLO. REV. STAT. § 13-80-107(2). The parties do not appear to dispute whether the equipment was new, and the record shows the equipment was delivered new in April 1997.

The Tenth Circuit considered the scope of the term "manufacturing equipment" in *Eaton v. Jarvis Products Corp.*, 965 F.2d 922 (10th Cir. 1992), and held that equipment used to slaughter cattle fell under the Colorado statute. Examining the legislative history, the court held that the legislature intended by "manufacturing equipment" to mean equipment that "is used to produce something that will be sold by the person who has produced it," and distinguished "manufacturing equipment" from consumer-used goods, such as drugs, cars, washing machines, and chemicals. *See id.* at 927–28. The court also stated, in *dicta*, that the legislature intended to distinguish "those pieces of equipment used in the large scale, coarse process of transforming live cattle to eviscerated carcass halves" from equipment used in "retail butchering, where larger cuts of meat are further refined and packaged for sale to consumers." *Id.* at 928. In 1994, Judge

4

Carrigan of this Court, relying on *Eaton*, clarified that equipment is "manufacturing equipment" so long as the end product "has a character and use distinct from the raw materials used." *See Villalobos v. Heidelberg Druckmaschien Artiengesellschaft*, 859 F. Supp. 1355, 1358 (D. Colo. 1994). These federal opinions are consistent with Colorado state court opinions holding that equipment that plays a role in the production of a product for commercial sale is manufacturing equipment. *See, e.g., Anderson v. M.W. Kellogg Co.*, 766 P.2d 637 (Colo. 1988) (conveyor belt used in a brick factory); *Urban v. Beloit Corp.*, 711 P.2d 685 (Colo. 1985) (steel rollers used to press paper); *Niemet v. Gen. Elec. Co.*, 843 P.2d 87 (Colo. Ct. App. 1992) (electrical transformer used in a metering station).

Judge Matsch, also of this Court, held in an unpublished 1997 opinion that asphalt paving equipment—under *Eaton* and *Villalobos*—was "manufacturing equipment" under the Colorado statute, even though "the use of equipment to pave a roadway would not commonly be considered production of something to be sold by the paving company." *See Krause v. Caterpillar Tractor Co.*, No. 96-M-2343, at p. 4 (D. Colo. March 12, 1997). Judge Matsch held that "what is controlling is that the machinery be used to make something different from the raw materials or prepared materials used in the operation or process and sold commercially." *Id*. Applying the rule to paving equipment, Judge Matsch noted that in the process of laying pavement, various materials, including sand, gravel, and liquid asphalt, are combined to form "hot mix" asphalt. *Id*. at p. 1. The "hot mix" asphalt is fed to the screed "which shapes and forms the raw asphalt, turning it into pavement." *Id*. at p. 2. The laid pavement—which the screed can form with varying width, density, or surface consistency depending on the requirements of the finished job—is the sold product.

5

Plaintiff argues the unpublished *Krause* order has no precedential value. Even discounting Judge Matsch's opinion, however, Plaintiff's claim that the screed is not "manufacturing equipment" is unsound.

It is not contested that asphalt pavement has "a distinctive name, character, or use from the raw or prepared materials used"—namely, sand, gravel, and liquid asphalt. Plaintiff argues in his papers that the screed itself does not alter the character of the materials, but rather lies at the endpoint of a delivery process. In that respect, Plaintiff characterizes paving equipment as being similar to a UPS truck, a machine whose sole purpose is delivery. At the February 28, 2008, hearing, however, Plaintiff conceded that the "hot mix" asphalt, after being applied to the road by the screed, is further compacted and smoothed by rolling machines before becoming pavement. Thus, contrary to Plaintiff's papers, the screed is not merely an "endpoint of a delivery process," but is a necessary link in the chain between raw materials and finished pavement.

Under the plain language of the Colorado statute, and the case law interpreting the statute, "manufacturing equipment" is defined as any equipment "used in the operation or process" of converting raw materials into something for sale. It is not necessary that the screed itself transform the raw materials into the finished material, so long as the screed is part of a manufacturing operation or process. The Colorado Supreme Court has previously held—in two published opinions—that a brick conveyor belt and a calendar stack—a machine that presses paper to a certain thickness and density and smooths the paper's surface—both qualify as manufacturing equipment. *See Anderson*, *supra*, 766 P.2d 637 (conveyor belt); *Urban v. Beloit Corp.*, *supra*, 711 P.2d 685 (calendar stack). A similar conclusion was reached in *Villalobos*, where the court held that a printing press, as a machine that applies ink to paper—without

6

modifying either—in a manner specified by the customer, was manufacturing equipment. *Villalobos*, *supra*, 859 F. Supp. at 1358. If these three machines each qualify independently as "manufacturing equipment" under the statute of repose, the screed—a machine that moves hot mix asphalt, like the conveyor belt, and compresses the asphalt to a certain thickness and density and smooths its surface, like the calendar stack, to create asphalt pavement meeting the specifications of the customer, like the printing press—also qualifies.

### B. The screed did not possess a hidden defect

Under the Colorado statute, "no such action shall be brought on a claim arising more than seven years after such equipment was first used for its intended purpose . . . except when the claim arises from injury due to hidden defects." COLO. REV. STAT. § 13-80-107(1)(b). Plaintiff argues the screed had as many as four hidden defects: (1) there was no way to override an inadvertent activation of one of the screed extension activation switches; (2) the screed was not provided with written manuals regarding the operation of more than one extension switch at a time; (3) the screed extension activation switches were not protected by a guard intended to prevent accidental activation; and (4) the screed extension tube did not have a guard to protect someone sitting on it from being caught in the "pinch point" between the tube and the body of the screed.

For a product to have a "hidden defect," it must have a defect that creates an unreasonably dangerous condition which is not readily apparent or discoverable by a reasonably prudent user. *See Anderson, supra*, 766 P.2d at 643. The test is an objective, not a subjective, one. *Id.* Generally, a defect is anything that makes a product "unreasonably dangerous" including a manufacturer's failure to provide adequate warnings or instructions for a product. *See id.* In the

context of the Colorado statute of repose, however, failure to warn or instruct is not included within the exception for hidden defects. *See id*. at 643–44. Further, while failure to place guards to protect a user from the dangerous areas of a machine may constitute a "hidden defect," failure to guard an open and obvious danger does not constitute a hidden defect within the meaning of the statute. *See id*. at 644.

The question of whether a product is defective and unreasonably dangerous is generally an issue for the jury. *Bartholic v. Scripto-Tokai Corp.*, 140 F. Supp. 2d 1098, 1107 (D. Colo. 2000). Whether an alleged unreasonably dangerous defect is hidden or obvious is also generally a question for the trier of fact. *Wayda v. Comet Int'l Corp.*, 738 P.2d 391, 393–94 (Colo. Ct. App. 1987), *overruled on other grounds by Anderson, supra*, 766 P.2d 637. Sometimes, however, whether a defect is hidden or obvious can be determined as a matter of law. *See, e.g., Eaton, supra*, 965 F.2d at 929; *Villalobos, supra*, 869 F. Supp. at 1359; *Anderson, supra*, 766 P.2d at 644. The Tenth Circuit in *Eaton*, for example, affirmed summary judgment, holding as a matter of law that the defect in question was open and obvious because "a reasonably prudent user would have appreciated that the unguarded trigger could be bumped, thereby activating the hockcutter." *Eaton, supra*, 965 F.2d at 929. Likewise, the Colorado Supreme Court in *Anderson* determined as a matter of law that the danger was open and obvious. *Anderson, supra*, 766 P.2d at 644.

The first alleged defect—no way to override an inadvertent activation of one of the screed extension activation switches—cannot be considered hidden. At the February 28, 2008, hearing, Plaintiff repeatedly described the defect as "failure to provide clear means" to override an accidental switch activation. Plaintiff's expert, Olaf Jacobson, likewise described the defect as the

8

failure to include "clear identification of the shut off procedure and an easily accessible, clearly marked emergency button," "a red mushroom shaped button," "an emergency shutoff switch that is clearly identified," or "a clear means to stop the screed retraction." Compared to *Niemet*, *supra*, 843 P.2d 87—in which the defect in an electrical transformer was not discoverable until the transformer was cut in half—the lack of a "clearly marked" override switch, "red mushroom shaped button" or other "clear means" to stop the screed retraction would have been immediately obvious had anyone bothered to look.

The other "hidden defects" alleged by Plaintiff also fall outside the exception to the statute of repose. In the context of the statute of repose, failure to warn or instruct is not included within the exception for hidden defects. *See Anderson, supra*, 766 P.2d at 643–44. Accordingly, the second alleged defect—failure to warn or instruct about the lack of an override switch—cannot constitute a hidden defect within the meaning of the statute. *See Anderson, supra*, 766 P.2d at 644.

Likewise, the failure of Defendant to place guards on either the extension switches or the "pinch point" does not constitute a hidden defect for purposes of the statute. *See Villalobos*, *supra*, 859 F. Supp. at 1358–59. The risk of injury from an accidental activation of the screed extension switches would be obvious to a reasonably prudent person. *See Eaton, supra*, 965 F.2d at 929 (holding where a reasonably prudent user would have appreciated that an unguarded trigger could be bumped, the danger inherent in the unguarded trigger did not constitute a hidden defect); *Villalobos*, *supra*, 859 F. Supp. at 1358–59. Plaintiff, in fact, admits he knew sitting on the extension tube was dangerous and that he could be crushed. Defendant's failure to guard the extension switches or the "pinch point" therefore falls outside the statutory exception for hidden

defects. *See Anderson*, *supra*, 766 P.2d at 644.

## IV.  CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment [**Docket # 23**] is GRANTED.

Dated: March   5  , 2008.

BY THE COURT:

   s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE